**FILED**

**Lucinda B. Rauback, Clerk**
**United States Bankruptcy Court**
**Augusta, Georgia**
*By jpayton at 11:05 pm, Mar 31, 2015*

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE

SOUTHERN DISTRICT OF GEORGIA
Dublin Division

| | | |
|---|---|---|
| IN RE: | ) | Chapter 7 Case |
| MORITZ DEVON HOLLOWAY | ) | Number <u>09-30446</u> |
| | ) | |
| Debtor | ) | |
| | ) | |
| TODD BOUDREAUX, CHAPTER 7 TRUSTEE | ) | |
| | ) | |
| Plaintiff | ) | Adversary Proceeding |
| | ) | Number <u>10-03015</u> |
| v. | ) | |
| | ) | |
| MORITZ D. HOLLOWAY, | ) | |
| D. DUSTON TAPLEY, JR., | ) | |
| TIDAL WATER PROPERTIES, INC., | ) | |
| INVERTED INC., AND JAY TAPLEY | ) | |
| | ) | |
| Defendants | ) | |

## OPINION AND ORDER

Before the Court is a motion for directed verdict filed by D. Duston Tapley Jr. ("Tapley") and his son, Jay Tapley, (jointly "Tapleys") pursuant to Federal Rule of Bankruptcy Procedure 7052[1] arguing they are entitled to judgment because the Chapter 7 Trustee ("Trustee") failed to carry his burden of proof to avoid the transfer of property pursuant to 11 U.S.C. §§547 and 548 and to

---

[1] While the motion is styled as a motion for directed verdict, pursuant to Federal Rule 52(c) the motion is a Motion for Judgment on Partial Findings. <u>See</u> Fed. R. Civ. P. 52 made applicable to this adversary proceeding by Federal Rule of Bankruptcy Procedure 7052.

✎AO 72A
(Rev. 8/82)

establish a breach of fiduciary duty.  These are core proceedings pursuant to 28 U.S.C. §157 and the Court has jurisdiction under 28 U.S.C. §1334.  At the end of the Trustee's presentation of evidence, Defendants moved for a directed verdict.  Pursuant to Federal Rule of Civil Procedure 52(c) the court "decline[d] to render any judgment until the close of the evidence" at which point Defendants announced they rested without presenting any additional testimony or evidence.

For the following reasons, the Tapleys' motion is granted as to the §547 action and denied as to the §548, Georgia Fraudulent Transfer Act and breach of fiduciary duty claims.  As for the §548, Georgia Fraudulent Transfer Act and breach of fiduciary duty claims judgment is entered in favor of the Trustee as set forth herein.

### FINDINGS OF FACT

The Trustee seeks to avoid the purported transfer of real property from Moritz D. Holloway ("Debtor") to Tapley, Inverted, Inc., Tidal Water Properties, Inc. ("Tidal Water") and Jay Tapley. Inverted, Inc. and Tidal Water are entities owned and controlled by Jay Tapley.  To prevail on the 11 U.S.C. §§547 and 548 actions, the Trustee must prove the transfer occurred during the relevant reach back periods of 11 U.S.C. §547 and §548, while Debtor was insolvent. In addition, to establish an 11 U.S.C. §548 claim, the Trustee also

✎AO 72A
(Rev. 8/82)

must show Debtor received less than reasonably equivalent value for the transfer. As for the breach of fiduciary duty, the Trustee must establish the existence of a fiduciary duty between the respective Defendants and the Debtor, a breach of this duty, and damages.

The respective reach back periods are: May 5, 2009 (90 days prior to the August 3, 2009 petition date) for the §547 action and to August 3, 2007 (two years prior to the August 3, 2009 petition date) for the §548 action.

This controversy includes issues related to the probate estate of Charlie Sharpe, Sr. ("Sharpe") who died in the 1950s. Sharpe's will was written in the 1930s wherein he acknowledged, without specificity, that he had made various inter vivos gifts of land to some of his heirs. According to the Tapleys and Debtor, one of these inter vivos gifts was to his son Arthur Sharpe and involves the purported 133 acres at issue in this adversary proceeding. There is no deed conveying this real property from Charlie Sharpe to Arthur Sharpe. According to Tapley's testimony, Sharpe's will is of record in the probate court, but it was never actually probated.

The first deed relevant to this adversary proceeding is where Arthur Sharpe purportedly conveyed the 133 acres to his niece, Eloise Deloach ("Deloach") by quit claim deed in 1978. Ex. 41. The deed was not witnessed or notarized, but it is recorded in the appropriate real estate records. Ex. 41.

3

Around 1999 to 2000, Tapley, a lawyer, began to try and settle the Sharpe estate.  Tapley provided legal representation to the Sharpe estate and several of the Sharpe heirs involved in the administration of the Sharpe estate, including claims by Deloach and other claims by Deloach's mother, Leila McAllister.  Various disputes arose among the respective heirs.

On Deloach's behalf, in January 2005, Tapley filed a motion to allow late claim in the Sharpe probate matter.  This motion was based upon the 1978 deed from Arthur Sharpe to Deloach.  Ex. 54.  In March 2005, the Probate Court entered an order allowing Deloach to file a late claim.  Ex. 55.  This order was subsequently appealed to and ultimately affirmed by the Superior Court in September 2007.  Ex. 56.

In December 2005, while the Probate Court's order granting Deloach's motion to allow late claim was on appeal, Deloach conveyed the purported 133 acres to the Debtor, her nephew, and this deed was recorded in the appropriate real estate records in August 2006.  Ex. 34.  Debtor testified that his Aunt Deloach lived out of state and was having medical issues and deeded mere "legal" title of the property to him to allow him to hold title in trust for her as her conduit to handle issues related to the land.  Trial Tr. Vol. 041614, 207-208, 211, 213, 218, and 224, April 16, 2014.  However, Deloach never executed an official power of attorney naming Debtor

4

as her agent.  Nevertheless, Debtor testified it was Deloach's intent for him to handle all of her business transactions involving the purported 133 acres with Tapley and otherwise.  Id.  Debtor further testified that his oral agreement with Deloach was that upon Deloach's death, Debtor would own the property outright.  Trial Tr. Vol. 041614, 213, April 16, 2014.[2]  Debtor held mere legal title with a contingent interest upon Deloach's death, and he was to be a conduit for these payments for Deloach until her death.  Deloach died in December 2007, sixteen months after the deed purportedly conveying title to Debtor was recorded.  Trial Tr. Vol. 041614, 213 and 226, April 16, 2014.

Shortly after Deloach deeded the property to Debtor, warranty deeds respectively transferring a one-third interest in the purported 133 acres from the Debtor to Tapley and Inverted, Inc. were executed and recorded in the appropriate real estate records ("the 2006 Deeds").  Ex. 21 and Ex. 22.  The legal description to the 133 acres is as follows:

> All that tract or parcel of land situate, lying and being in the 275th District, G.M., Montgomery County, Georgia containing 133 acres, more or less, and bounded, now or formerly, as follows: On the North by lands of Isiah Blount; on the East by lands of the Charlie Sharpe Estate; on the South by lands of

---

[2] Deloach's purported heirs signed the June 2009 Mullis Order discussed hereafter.

5

> Carrie Sharpe Currie; and on the West by lands
> of Hack Chambers. Said tract of land is one of
> the same as referred to in the Will of Charlie
> H. Sharpe, Sr., recorded in Minute Book Number
> 10, pages 514-33, Montgomery County, Georgia
> Probate Court Records, being referred to as
> land already given to children in Item III
> thereof. See Deed Book 74, page 252,
> Montgomery County, Georgia Deed Records.

Ex. 22.

Debtor and Tapley testified, and the written fee agreement with Deloach confirms, Tapley was to obtain a 33 1/3 contingency fee "of all sums recovered before filing suit and if suit is filed, 40% of all sums recovered", plus expenses. Employment Agreement between Tapley and Deloach, Ex. 80; Trial Tr. Vol. 041614, 47 and 225, April 16, 2014. "[I]f there [was] no recovery, there [would] be no fee...." Id. Tapley and Debtor testified this conveyance was in regards to the contingency fee agreement. However, the conveyance of this one-third interest was done while the matter was still on appeal and before the parties reached an agreement or distribution. Exs. 55 and 56. Tapley testified that at the time of the transfer, he was confident things were going to work out.

For its one-third interest, Inverted, Inc. was to pay Debtor $60,000.00. Ex. 22. A deed to secure debt[3] from Inverted, Inc. in favor of Debtor was executed and recorded. Ex. 61. No

---

[3] Prepared by Tapley.

6

promissory note was ever prepared or executed.   Trial Tr. Vol. 041614, 207-208, 211, 213, 218, and 224, April 16, 2014.

This security deed was ultimately cancelled by Debtor in May 2007, before Deloach's death.  Ex. 61.  Debtor testified that before he executed the cancellation of the security deed, he and Jay Tapley walked the land and realized there was a problem with the acreage and a court-ordered survey was obtained and showed the actual acreage of this land was 76.06 acres, not the purported 133 acres.  Tr. Vol. 041614, 248-49, April 16, 2014.  Debtor stated that before the court ordered survey, he did not know everyone's acreage allocation or the discrepancies therein.  Tr. Vol. 041614, 223, 278, April 16, 2014.  In January 2007, due to this decrease in acreage and after walking the land and realizing there was a problem in the acreage, while Deloach was still living, Debtor executed two deeds entitled "Corrected Warranty Deeds" wherein he purports to respectively convey a one-half interest in 76.06 acres to Tapley and Inverted, Inc.[4]  Exs. 23 and 24.  These Corrected Warranty Deeds were recorded March 18, 2009, more than two years after the execution date, and during the pendency of the Debtor's initial chapter 13 petition, and less than six months before Debtor filed

---

[4]   Debtor testified he discussed the March 2009 Deeds with Deloach so she was aware of them prior to their execution.  Trial Tr. Vol. 041614, 250-51, April 16, 2014.

7

his current bankruptcy petition. (Collectively, these Corrected Warranty Deeds are referred to as "the March 2009 Deeds"). Tapley testified it was an inadvertent oversight for these deeds not to be recorded contemporaneously with their execution. Trial Tr. Vol. 041614, 91, April 16, 2014. He stated it simply fell through the cracks. Id. Tapley testified he was not waiting on a final order from the Superior Court before he recorded the March 2009 Deeds. Trial Tr. Vol. 041614, 93, lines 9-13, April 16, 2014.

Tapley testified that the purpose of the March 2009 Deeds was to correct the amount of acreage and because Debtor approached him and told him that the acreage had shrunk from 133 acres to 76 acres and that Debtor wanted to sell out and be done with the whole transaction. Trial Tr. Vol. 041614, 92 lines 1-9, April 16, 2014. In addition, Jay Tapley testified the purpose of the March 2009 Deeds was to give approximately the same acreage as previously agreed to by the parties, explaining that when you divide 133 acres by 3, "you come up with about the same acreage that was half of 76 acres." Trial Tr. Vol. 041514, 40, lines 6-10.

Debtor testified the March 2009 Deeds were executed due to the decrease in acreage and he wanted to make good on his initial promise and convey a comparable value so instead of one-third of 133 acres, Inverted, Inc. and Tapley each received one-half of 76 acres. Trial Tr. Vol. 041614, 226, lines 5-12; Trial Tr. Vol. 041614, 227,

AO 72A
(Rev. 8/82)

lines 12-21.

From the testimony of Debtor and the Tapleys, the initial purpose of the deed to Inverted, Inc. was for Debtor, as agent for Deloach, to enter into a joint venture type arrangement whereby Jay Tapley would market and sell the property and they would divide the sale proceeds.   No joint venture agreement was ever prepared or agreed to by the parties.   After the transfer, the real estate market weakened and Deloach and Debtor had cash flow needs before a sale materialized. Trial Tr. Vol. 04161465, 231, 250, April 16,2014. According to the ledger kept by Jay Tapley for Inverted, Inc., Inverted, Inc. paid approximately $24,300.00 to Debtor, as agent for Deloach, to be credited against the purchase price of $60,000.00. Ledger, Ex. 40; Trial Tr. Vol. 041614, 65, 210-11, 218 and 246, April 16, 2014; Trial Tr. Vol. 041514, 29-32, April 15, 2014. According to Debtor and Tapley on or about May 1, 2007, approximately $5,000.00[5] of the $24,300.00 went to pay Vidalia Federal, Debtor's mortgage holder.  Ex. 40; Trial Tr. Vol. 041514, 85-86, April 15, 2014; Trial Tr. Vol. 041614, 81, 85, 246, 251-52, April 16, 2014.   Debtor stated this payment to his mortgage holder was done with Deloach's consent.  Trial Tr. Vol. 041614, 214, lines

---

[5]   Tapley actually paid Debtor $5,000.00 through one of his entities, but Jay Tapley credited the $5,000.00 given to Debtor on the ledger he kept for Inverted, Inc.  Ex. 40.

✎AO 72A
(Rev. 8/82)

16-18.

Jay Tapley further testified that the price was adjusted due to the acreage decrease and because "it was a battle about trying to sell it for years, there was a lot of circumstances that came into play," including the well known crash of the real estate market.  Trial Tr. Vol. 041514, 34, April 15, 2014.  He also testified the payments for the purchase also were made in cash and included costs incurred by Inverted, Inc. in maintenance and upkeep of the property.  Ledger, Ex. 40; Trial Tr. Vol. 041514, 29-32, April 15, 2014.  Debtor acknowledged the purchase price was reduced due to decrease in the acreage, but said he never agreed to pay for any upkeep or maintenance.  Trial Tr. Vol. 041614, 212 and 227, April 16, 2014.

On or about May 21, 2007, shortly after the $5,000.00 advance, Debtor executed a cancellation of the security deed from Inverted, Inc.  Ex. 61.  Debtor testified he did not realize this cancellation actually extinguished the debt.  Trial Tr. Vol. 041614, 229, April 16, 2014.  In connection with Debtor's execution of the March 2009 Deeds he testified that he explained to Deloach that they were out of the ownership of the property, but they still would have funds coming in from the ultimate sale of the property to a third party.  Id. at 230-31.

In June of 2009, after much state court litigation

10

regarding the proper distribution of the Sharpe estate, a settlement was ultimately reached among the heirs. The Honorable H. Frederick Mullis, Jr., Superior Court Montgomery County, issued his June 15, 2009 order memorializing the settlement reached by a majority of Sharpe's heirs and ordered that "[Debtor] shall receive 76.06 acres designated 'Arthur Sharpe'" on the plat. ("June 2009 Mullis Order")[6]. Ex. 2. This order was prepared by Tapley, as the attorney involved in resolving the estate issues. The June 2009 Mullis Order further directs Tapley to prepare administrator deeds consistent with the terms of the order. Id. The order is signed by numerous heirs and stakeholders in the Sharpe estate. Id. The June 2009 Mullis Order was subsequently amended on September 3, 2009 (the "September 2009 Order") to read "[Debtor] **or his assigns** shall receive 76.06 acres", presumably because the deeds from Debtor purportedly conveying his interest in the property had already been executed and recorded. Ex. 25. (emphasis added to reflect the new language).

Sharpe's Administrators, Hilton Sharpe and Mattie Lou Holloway, executed an Administrators' Deed of Assent ("Administrators' Deed") prepared by Tapley on July 23, 2009

---

[6] Many parties signed the order including Deloach's purported heirs.

11

conveying the 76.06 acres directly to Tidal Water, a company controlled by Jay Tapley, not the Debtor.   Ex.  3.    This Administrators' Deed was executed and recorded in the real estate records on July 24, 2009, approximately ten days before Debtor filed his current bankruptcy petition.   There is no deed from the Sharpe Administrators into Debtor.

In October 2009, Tidal Water sold the property to Robert L. Jones, Jr. ("Mr. Jones") for a sales price of $114,000.00.   Ex. 6; Trial Tr. Vol. 012814, 90, lines 21-24, January 28, 2014.   This is less than the October 8, 2009 appraised value of the property of $160,000.00 obtained by Mr. Jones' lender at the time of closing. Ex. 7.   After Debtor filed his bankruptcy petition, at the request of Mr. Jones' closing attorney, Debtor executed an affidavit on October 22, 2009 stating that he had assigned his interest in the property to Tidal Water and had instructed the Administrators of the Sharpe estate to make the deed to Tidal Water.    Ex.   5. Contemporaneously thereto Tapley and Inverted, Inc. also conveyed any interest they had in the property to Tidal Water.   Ex. 60.

Contrary to Debtor's expectations, Debtor testified he did not receive any proceeds from the sale of the property to Mr. Jones. Debtor testified that he left a message for Jay Tapley and contacted Tapley to collect on the debt but Tapley refused and said "a deal is a deal" and told Debtor to sue him because he was not giving Debtor

12

another dime.   Trial Tr. Vol. 041614, 273-274, April 16, 2014.
Debtor testified he wanted to sue Tapley but his mother, Mattie
Holloway told him to leave it alone.  Tr. Vol. 041614, 274-5, April
16, 2014. Tapley also represented Ms. McAllister in the Sharpe
estate.  Debtor's mother and Deloach were daughter's of McAllister
and under the June 2009 Mullis Order, Mattie Holloway was entitled
to receive a one-third interest in 173 acres from the Sharpe estate.
Ex. 2.

Debtor filed the current chapter 13 petition on August 3,
2009, approximately ten days after the execution and recordation of
the Administrators' Deed into Tidal Water and before Debtor's
affidavit regarding the assignment.   The chapter 13 case was
subsequently converted to chapter 7 on April 22, 2010 and the
Trustee was appointed.  Debtor stated the conversion to a chapter 7
was due to an on-the-job injury.  Trial Tr. Vol. 041614, 303, April
16, 2014.

Debtor testified that in 2007 and onward he was
intermittently having cash flow troubles making his mortgage
payments but he had enough assets to satisfy all of his outstanding
debts.   Trial Tr. Vol. 041614, 231, April 16, 2014.  Debtor also
stated that losing the ability to collect on the full purchase price
further compromised his ability to pay his creditors.   Trial Tr.
Vol. 041614, 231-232, April 16, 2014.  Debtor testified at the time

13

of filing his bankruptcy petition he was "current on everything pretty much at that time," but he also acknowledged he was "slow" in making his payments but not "massively" behind.  Id. at 299, 303.

The Trustee argues title to the 1,000 +/- acres owned by Sharpe, including the property in question, remained unresolved until the June 2009 Mullis Order.  He argues that none of the deeds prior to the June 2009 Mullis Order transferred title in any property to Tapley, Inverted, Inc. or Tidal Water because Debtor did not have a clear right to title until the June 2009 Mullis Order. The Trustee asserts the deed from Arthur Sharpe to Deloach is invalid because it was never properly witnessed or notarized.  He further argues the legal description of the 133 acres in the 2006 Deeds is legally insufficient to convey title to the 76.06 acres. The Trustee argues the description used to convey the property did not become legally sufficient and authorized until the June 2009 Mullis Order and the July 2009 Administrators' Deed which were both within the respective reach back periods and therefore any purported assignment by Debtor falls within the respective reach back periods. The Trustee also alleges the Tapleys breached their respective fiduciary duties to Debtor.

Conversely, the Tapleys assert various defenses to the Trustee's complaint.  They argue the Trustee failed to establish insolvency as required to avoid the transfer.  In addition, they

14

argue they obtained title outside the reach back periods when the 2006 Deeds conveying the one-third interests to Tapley and Inverted, Inc. were recorded in 2006. Notwithstanding the terms of the June 2009 Mullis Order they further assert Georgia's pre-1998 Probate Code controls and under that version of the Probate Code, Arthur Sharpe had a vested property interest when he conveyed the property to Deloach in 1978. While Charlie Sharpe had a will, the Tapleys contend it was never probated and therefore it is treated as an intestate estate. Under the Tapleys' interpretation of the pre-1998 Probate Code, title to real property vested immediately in the heirs subject to administration by the legal representative. With title vesting immediately in the heirs, they argue Deloach had a valid legal title which she transferred to Debtor in 2006 and Debtor conveyed the one-third interest in 2006 and his remaining interest to them in 2007 when he signed the March 2009 Deeds, which are outside the reach back period. The Tapleys also argue no fiduciary duty existed between the parties.

Jay Tapley also asserts the Trustee failed to prove that he was personally liable as the Trustee failed to pierce the corporate veil of Inverted, Inc. or Tidal Water and he argues the Trustee failed to properly serve him and therefore the court lacks personal jurisdiction over him.

15

### CONCLUSIONS OF LAW

### §547 Preference-Count One of the Complaint.[7]

Under 11 U.S.C. §547,[8] the Trustee may avoid a transfer of

---

[7]  While this order is divided under various subheadings, many of the arguments and analysis overlap and are not repeated in the separate subsections.  Nevertheless, the applicable analysis in one subsection is intended to also apply in other sections.

[8]  11 U.S.C. §547(b) states in pertinent part:

(b) Except as provided in subsections (c) and (i) of this section, the trustee may avoid any transfer of an interest of the debtor in property--

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made-

(A) on or within 90 days before the date of the filing of the petition; or

(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if--

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

16

an interest of the Debtor to or for the benefit of a creditor, for or on account of an antecedent debt, made while the Debtor is insolvent and made within 90 days before the date of the filing of the petition which enabled the creditor to receive more than it would in a chapter 7 case if the transfer had not been made. 11 U.S.C. §547. The Trustee has the burden to prove each of these elements by a preponderance of the evidence. In re Venice-Oxford Assocs. Ltd. P'ship, 236 B.R. 820, 825 (Bankr. M.D. Fla. 1999).

After considering all the evidence presented, the Court concludes the Trustee has failed to carry his burden of proof as to 11 U.S.C. §547. Under §547, the Trustee has to establish by a preponderance of the evidence that Debtor was insolvent at the time of the transfer. Pursuant to 11 U.S.C. §101(32), "insolvent" means:

> with reference to an entity other than a partnership and a municipality, financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation, exclusive of
>
> (i) property transferred, concealed, or removed with intent to hinder, delay, or defraud such entity's creditors; and
>
> (ii) property that may be exempted from property of the estate under section 522 of this title

11 U.S.C. §101(32).

17

To prevail, the Trustee must show Debtor's liabilities exceeded his assets.   See _In re Bond_, 1991 WL 11002471, at *3 (Bankr. S.D. Ga. Dec. 13, 1991)(applying definition of insolvency to individual debtor and noting "insolvency means that there is insufficient value in assets to pay all debts in full").   Pursuant to §547(f), there is a rebuttable presumption that a debtor is insolvent for purpose of a §547 during 90 days preceding the filing of the bankruptcy petition.   11 U.S.C. §547(f).   "The presumption requires the party against whom the presumption exists to come forward with some evidence to rebut the presumption, but the burden of proof remains on the party in whose favor the presumption exists [the Trustee in this case]."   _In re Park at Briarcliff, Inc._, 2013 WL 8214715, at *4 (Bankr. N.D. Ga. August 6, 2013).

In reviewing Debtor's solvency at the time of the purported assignment from Debtor to Tidal Water in 2009 and including the $114,000.00 transfer value of the 76.06 acres to Debtor's other assets, Debtor's assets well exceeded his liabilities.   _In re Big Three Transp., Inc._, 41 B.R. 16, 20 (Bankr. W.D. Ark. 1983)("It is true that the property transferred must be included among the debtor's assets when its insolvency at the time of the transfer is at issue.") _citing In re Utrecht Coal Co._, 63 F.2d 745 (2d Cir. 1933); _see also_ 2 Collier On Bankruptcy ¶101.32, 101-146 (16th ed. 2009)(property subject to a §547 preference action

18

must be counted as an asset of the Debtor when solvency at the time of the transfer itself is determined); see also In re Smith, 236 B.R. 91 (Bankr. M.D. Ga. 1999); 4 Norton Bankruptcy Law & Practice §66:13 (3d ed. 2015). There also was no evidence of an actual intent to defraud Debtor's creditors by this transfer. Therefore, the transferred property is not excluded under 11 U.S.C. §101(32)(A)(i). When considered with the asset/liability analysis provided hereafter, under the §547 analysis, Debtor's assets would well exceed his liabilities.

For these reasons, based upon the evidence, the Court finds the presumption of insolvency under §547 was rebutted and the Trustee has not established by a preponderance of the evidence that Debtor was insolvent for purposes of §547. See In re Sportsman's Link, Inc., 2011 WL 2632079 (Bankr. S.D. Ga. May 24, 2011)("Insolvency is a common and necessary element which the Trustee must prove in order to prevail in each of these cases. 11 U.S.C. §§547 and 548. With no showing of insolvency, there is no basis on which [the Trustee] could prevail. . . ."). For this reason, based upon the evidence, the Trustee may not avoid the transfer as a preference under 11 U.S.C. §547.

§548 Fraudulent Transfers-Count Two of the Complaint.

The Tapleys also argue the Trustee failed to duly establish the necessary elements to avoid the transfer under 11

19

U.S.C. §548.[9] Under 11 U.S.C. §548, the trustee may avoid any transfer of an interest of the debtor in property that was made within two years prior to filing the bankruptcy petition if he can prove Debtor transferred the property with actual intent to hinder delay or defraud his creditors or the Trustee must prove the debtor "received less than a reasonably equivalent value in exchange for such transfer and was insolvent on the date that such transfer was

---

[9] 11 U.S.C. §548 states in pertinent part:

(a)(1) The trustee may avoid any transfer (including any transfer to or for the benefit of an insider under an employment contract) of an interest of the debtor in property, or any obligation (including any obligation to or for the benefit of an insider under an employment contract) incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

(A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or

.
.
.

(B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation.

20

made or such obligation was incurred, or became insolvent as a result of such transfer or obligation." 11 U.S.C. §548(a)(1)(A) and (B). The Trustee bears the burden of proving all the elements of 11 U.S.C. §548(a) by a preponderance of the evidence. <u>In re Norton</u>, 2014 WL 4080359, *2 (Bankr. N.D. Ga. Aug. 15, 2014)("[T]he Plaintiff bears the burden of proving all elements under section 548(a)(1) by a preponderance of the evidence."). The Trustee concedes in his brief that Debtor did not have actual intent to hinder, delay or defraud his creditors therefore he pursues his claim pursuant to 11 U.S.C. §548(a)(1)(B).

To prevail under §548(a)(1)(B) the Trustee must establish the Debtor transferred his "interest in property" within the two year reach back period. Contrary to the express language of the June 2009 Mullis Order, there is no deed from the Sharpe Administrators to Debtor conveying the property. There also is no actual assignment from Debtor to Tidal Water of record. Debtor's affidavit executed post-petition confirms that he did make such an assignment to Tidal Water and he instructed the Sharpe Administrators to deed the property to Tidal Water, but it fails to reflect when the assignment was actually given. Ex. 5. From a timing perspective, the Trustee argues, and the Court agrees, that the assignment of Debtor's interest in the property to Tidal Water would have to have occurred sometime after entry of the June 2009

21

Mullis Order (the first time the Administrators are directed to issue a deed to Debtor) but before execution of the July 2009 Administrators' Deed into Tidal Water.

The Tapleys argue that they had obtained title well outside the reach back periods when Debtor executed the 2006 Deeds conveying a one-third interest respectively to Tapley and Inverted, Inc., and then again in January 2007 when Debtor executed the March 2009 Deeds conveying a respective one-half interest to Tapley and Inverted, Inc. in the 76 acres. I disagree. Title remained unclear until the June 2009 Mullis Order becoming a final non-appealable order.

The Tapleys argue that the pre-1998 Probate Code is the controlling law in determining the rights to the Sharpe estate since he died in 1955. Charlie Sharpe had a will that was filed with the Probate Court but it was never probated. The Tapleys argue this means the Sharpe estate is administered under the laws of intestacy under the pre-1998 Probate Code. However, the Tapleys acknowledge Debtor is not an heir of Charlie Sharpe. Trial Tr. Vol. 041614, 41, April 16, 2014. Furthermore, the distributions among the heirs was subject to numerous challenges. The rights of the heirs were disputed and litigated up until the June 2009 Mullis Order. Heirs may decide to settle claims that may be contrary to the terms of a will.

22

> As to real property, upon the death of the testator, devisees have an inchoate title to realty which can be voluntarily conveyed and is an assignable property right. <u>Allan v. Allan</u>, 236 Ga. 199, 201, 223 S.E.2d 445 (1976). Agreements among heirs to distribute or divide property devised under a will, in lieu of the manner provided by the will, are valid and enforceable. <u>Higdon v. Ga. Farm Bureau, etc., Ins.</u>, 204 Ga. App. 192, 193, 419 S.E.2d 80 (1992). 'It is also settled law that [beneficiaries] by their agreement bind themselves thereto as well as those claiming under them.' <u>McVay v. Anderson</u>, 221 Ga. 381, 382, 144 S.E.2d 741 (1965). 'Such agreements have as their consideration the termination of family controversies . . . [and] are supported by the public policy of furthering family harmony and avoiding lengthy litigation. The agreements are in essence solely contractual and governed by the rules applicable to all contracts.' (Citations and punctuation omitted.) <u>Beckworth v. Beckworth</u>, 255 Ga. 241, 243(1)(a), 336 S.E.2d 782 (1985).

<u>Bradley v. Bradley</u>, 484 S.E.2d 280, 283 (Ga. Ct. App. 1997); <u>see also</u> <u>Evans v. Little</u>, 271 S.E.2d 138, 140 (Ga. 1980)(noting that heirs of an intestate estate are vested with their respective interests and the proper remedy for a division of their interests was through a partitioning action in Superior Court). While inchoate rights may be voluntarily transferred they are subject to fraudulent transfer avoidance. <u>See</u> <u>Hollberg v. Spalding Co.</u>, 637 S.E.2d 163 (Ga. Ct. App. 2006). This Court will not now say the pre-1998 Probate Code applies substituting that disposition for judgment reached in the June 2009 Mullis Order with the signatures

23

of the numerous consenting parties.

Furthermore, title to the land was unclear even assuming Arthur Sharpe had a vested interest to convey under Georgia's prior Probate Code.  First, Debtor testified he held only bare legal title to this property in order to act as Deloach's agent, until her death in December 2007.  Tapley acknowledges Debtor was not an heir to Deloach.  Trial Tr. Vol. 041614, 41, April 16, 2014.  Second, the deed from Arthur Sharpe to Deloach was never witnessed or notarized. See Ex. 41.  A deed that is unwitnessed and not notarized is a patent defect and does not provide constructive notice.  See In re Bailey, 2011 WL 2971907, *2 (Bankr. N.D. Ga. May 24, 2011) citing U.S. Bank Nat'l Ass'n v. Gordon, 709 S.E.2d 258 (Ga. 2011)(security deed that lacked official and unofficial attestation was not "duly recorded" and does not provide constructive notice); see also 2 Pindar's Georgia Real Estate & Procedure §19-130 (6th ed. 2004)(A deed made by a grantor with no apparent record title does not constitute constructive notice.).  Furthermore, the legal descriptions contained in the prior warranty deeds referring to the 133 acres were legally deficient because there is no clear point of origin for which to obtain the boundaries.  See In re Foster, 2014 WL 4264848, *3 at n. 5 (S.D. Ga. August 27, 2014) citing Callaway v. Armour, 65 S.E.2d 585, 587 (Ga. 1951)(finding a property description

insufficient where there is no definite beginning point) and Dodd v. Madaris, 57 S.E.2d 597, 598-99 (Ga. 1950)(holding that, in a suit for land, a property description with "an unascertainable starting point is unquestionably too indefinite and uncertain to afford a basis for any identification of the property sought to be recovered"); see also Lord v. Holland, 655 S.E.2d 602, 604 (Ga. 2008)(invalidating a property description that "did not include a beginning point or other specifications enabling one to definitively locate the property to be conveyed."). Because title to the property was unclear until the June 2009 Mullis Order[10], the transfer the Trustee seeks to avoid falls within the two year reach back period of 11 U.S.C. §548.

Next, the Trustee must establish Debtor received less than a reasonably equivalent value in exchange for the transfer of the property. There is no dispute that Debtor did not receive any consideration from Tidal Water for assigning his interest in the

[10] Also, it is noteworthy Deloach died in December 2007 the effective date of a corrective deed is the date it is recorded, and it does not relate back to the execution date especially against a bona fide purchaser for value. See SunTrust Bank v. Equity Bank, S.S.B.,719 S.E.2d 539, 540 (Ga. Ct. App. 2011) ("The filings and recordation of the instrument provide constructive notice to subsequent purchasers of the existence of a prior interest in the property); Green Rivers Forrest, Inc. v. Aetna Life Ins. Co. (In re Green Rivers Forrest, Inc.), 200 B.R. 956, 959-60, n. 9 (Bankr. M.D. Ga. 1996) (the date of recordation of the corrective deed is the effective date).

25

property to Tidal Water or for the transfer to Jones.  Even giving the Tapleys the full amount of money of the $24,300.00 shown on the ledger this is not reasonably equivalent value for property. Therefore, the Court finds the Trustee has established Debtor assigned his interest to Tidal Water for less than reasonably equivalent value.

Finally, for purposes of his §548(a)(1)(B) claim, the Trustee must establish the assignment of Debtor's interest occurred while Debtor was insolvent or became insolvent as a result of the transfer.  "The analysis of solvency for fraudulent conveyance purposes is a 'balance sheet test,' examining whether debts in the aggregate are greater than assets in the aggregate." In re Tronox Inc., 503 B.R. 239 (Bankr. S.D.N.Y. 2013).  Unlike a §547 claim, there is no rebuttable presumption of insolvency in §548(a). See In re Rite Way Elec., Inc., 510 B.R. 471, 482 (Bankr. E.D. Pa. 2014)("unlike in a preference action, insolvency in a fraudulent transfer action is not presumed").  Also, the §548(a)(1)(B) analysis considers whether the Debtor became insolvent as a result of the transfer.  See 11 U.S.C. §548(a)(1)(B)(ii)(I)(was insolvent or became insolvent as a result of such transfer or obligation); Kipperman v. Onex Corp., 411 B.R. 805, 835 (N.D. Ga. 2009)(plaintiff must show "was insolvent on the date that such transfer was made or

26

such obligation incurred or would become so as a result of the transfer or obligation.").

After considering all the evidence, I find the Debtor was insolvent at the time of the transfer for purposes of 11 U.S.C. §548(a)(1)(B). The solvency test requires the Court to apply a fair valuation of Debtor's property and to determine if Debtor's liabilities exceed his assets at the time of the transfer. 11 U.S.C. §101(32). "Values assigned to assets by a debtor are not necessarily determinative of their fair value." In re Hoffman Indust., Inc., 313 B.R. 812, 819 (Bankr. E.D. Ark. 2004).

At the trial, the Trustee questioned Debtor about his bankruptcy schedules and the value of Debtor's assets and liabilities, and called some of the values in the schedules into question, particularly the value of Debtor's residence. Debtor's bankruptcy schedules show his assets ($144,079.00) exceed his liabilities ($127,404.57). Debtor's Schedules, Ex. 1. In his schedules, Debtor valued his home at $125,000.00 based upon the tax assessor's valuation. However, in 2009, Debtor attempted to sell the house for $100,000.00 and had several contracts but the potential buyers failed to qualify for financing. Trial Tr. Vol. 041614, 293-94, 301, April 16, 2014. Debtor priced the property basically at the mid-point between the tax assessor's value and

27

outstanding debt owed on the property. He testified $100,000.00 was not a total fire sale and not a total giveaway. Trial Tr. Vol. 041614, 302, April 16, 2014. Debtor testified he was familiar with the timber value on the property, the unique qualities of this property and the repairs needed when he priced the home. Trial Tr. Vol. 041614, 321, April 16, 2014. While the tax assessor's value is frequently used in bankruptcy schedules it often is not the fair value of the property. There often is a lag in assessments and the county has a interest in maintaining its tax base, so it is not unusual for the actual fair value of property to be less than the tax assessor's value. Given the evidence presented, the Court finds the "fair value" of the home place is $100,000.00. See In re SOL, LLC, 2012 WL 2673254 *10 (Bankr. S.D. Fla. July 5, 2012)("[T]he Bankruptcy Code and case law supports the conclusion that the valuation of assets at 'fair value' for purposes of insolvency under the balance sheet test focuses on fair market value of the Debtor's assets and liabilities within a reasonable time of the transfer."). Adjusting Debtor's schedules by this fair value of the home place results in a total assets of $119,079.00, which on a balance sheet test does not exceed Debtor's liabilities of $127,404.57 on his schedules, or the liabilities set forth on the claims register. See 11 U.S.C. §101(32)(balance sheet test); In re Tronox Inc., 503 B.R.

28

at 296 ("[T]he analysis of solvency for fraudulent conveyance purposes is a 'balance sheet test,' examining whether debts in the aggregate are greater than assets in the aggregate."). The removal of Debtor's exemptions of $15,450.00 from his assets further increases Debtor's insolvency. 11 U.S.C. §101(32)(A)(ii); See In re Smith, 236 B.R. 91, 97 (Bankr. M.D. Ga. 1999)(applying the balance sheet test for insolvency and noting that exemptions are excluded from total assets in the insolvency calculation). Given these facts, for purposes of §548(a)(1)(B) the Trustee has established by a preponderance of the evidence that Debtor became insolvent at the time of the transfer in 2009.

Furthermore, while Debtor testified he was current on his payments to creditors at the time he filed his bankruptcy petition, he acknowledged he was slow in making his payments but he was not massively behind. Trial Tr. Vol. 041614, 299, 303, April 16, 2014. There also was ample testimony from various parties, including the Debtor, about his cash flow problems. His bankruptcy plan also reflects an arrearage of more than $5,700.00 owed to his mortgage company at the petition date. Dckt. No. 4. It also is undisputed he had a previous chapter 13 case filed March 2, 2009 and dismissed June 30, 2009 and his schedules have the same valuations. See Ch. 13 Case No. 09-30123 (Bankr. S.D. Ga. 2009). While cash flow

problems do not establish insolvency, these facts further evidence Debtor's financial problems.

For these reasons and after considering all the evidence and observing the witnesses, the Court finds the Trustee has established by a preponderance of the evidence the elements necessary to prevail on his §548 claim.

**Georgia Fraudulent Transfer Act.**

The Trustee's complaint also alleges the Georgia Fraudulent Transfer Act claim pursuant to O.C.G.A. §18-2-74.[11] To

---

[11]   O.C.G.A. §18-2-74 states in pertinent part:
(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

(1) With actual intent to hinder, delay, or defraud any creditor of the debtor

(b) In determining actual intent under paragraph (1) of subsection (a) of this Code section, consideration may be given, among other factors, to whether:

(8) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred; [and]

(9) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred.

30

prevail under the Georgia Fraudulent Transfer Act, the Trustee must prove that transferor "(1) received less than reasonably equivalent value in consideration for the transfers and (2) was insolvent at the time the transfer was made or was rendered insolvent as a result of the transfer." Kipperman v. Onex Corp., 411 B.R. 805 (N.D. Ga. 2009); In re Greenberg, 2003 WL 21919441, at *3 (Bankr. S.D. Ga. May 13, 2003)(noting that under the predecessor statute to O.C.G.A. §18-2-74 the trustee must prove by a preponderance of the evidence that the transactions were fraudulent). As previously discussed, the Trustee has established Debtor was rendered insolvent as a result of the transfer and received less than reasonably equivalent value for the transfer. See O.C.G.A. §18-2-72(a)(requiring the court to find the fair value of the property); see also In re Palisades at W. Paces Imaging Ctr., LLC., 501 B.R. 896, 910 (Bankr. N.D. Ga. 2013)("The UFTA instructs further that the value of the debtor's property is to be calculated 'at a fair valuation'. . . . This is the same phrase used in the definition of insolvency in the Bankruptcy Code. 11 U.S.C. §101(32).")(internal citation omitted); In re McFarland, 2013 WL 5442406 *6 (Bankr. S.D. Ga. Sept. 30, 2013)(O.C.G.A. §18-2-74 is virtually identical to 11 U.S.C. §548). For the reasons discussed herein, the Court finds the Trustee has

31

established his claim under O.C.G.A. §18-2-74 by a preponderance of the evidence.

**Breach of Fiduciary Duty.**

In order to prevail on a breach of fiduciary duty claim, the Trustee must establish: (1) the existence of fiduciary duty; (2) a breach of that duty; and (3) damages proximately caused by the breach. Rollins v. Rollins, 766 S.E.2d 162, 166 (Ga. Ct. App. 2014). A relationship is "deemed confidential, whether arising from nature, created by law, or resulting from contracts, where one party is so situated as to exercise a controlling influence over the will, conduct, and interest of another or where, from a similar relationship of mutual confidence, the law requires the utmost good faith, such as the relationship between partners, principal and agent, etc." O.C.G.A. §23-2-58.

The Trustee concedes there was no express attorney-client relationship in this matter between Debtor and Tapley. The Trustee seeks to hold Tapley liable for a breach of fiduciary duty owed to Debtor arguing a confidential attorney-client relationship may be implied based upon the facts of the case with Tapley putting the parties together, drafting all documents, preparing all the deeds, and utilizing his influence over Debtor to obtain the property for his own personal gain.

32

> Though an attorney-client relationship
> generally is a matter of express contract, it
> may be implied from the conduct of the parties.
> '[T]he employment is sufficiently established
> when it is shown that the advice or assistance
> of the attorney is sought and received in
> matters pertinent to his profession.'
> Moreover, [w]hile the payment of a fee is
> relevant to the inquiry and may in some
> circumstances be controlling, an
> attorney-client relationship may be found to
> exist where no fee is paid[,] and the payment
> of a fee does not necessarily demonstrate the
> existence of the relationship. All that is
> necessary is a 'reasonable belief' on the part
> of the would-be client that he or she was being
> represented by the attorney. A reasonable
> belief is one which is reasonably induced by
> representations or conduct on the part of the
> attorney.

Cleveland Campers, Inc. v. R. Thad McCormack, P.C., 635 S.E.2d 274,

276-77 (Ga. Ct. App. 2006)(citations omitted). After considering

all the evidence and observing the demeanor of the parties, the

Court finds the Trustee has established an implied attorney-client

relationship between Debtor and Tapley. While Debtor is an educated

individual, there is no doubt Debtor trusted and relied upon

Tapley's legal advice. At the time of these dealings, Debtor was

operating a farm and various other businesses. All of which were

causing financial difficulties for Debtor, of which Tapley was well

aware. Trial Tr. Vol. 041614, 65 and 186, April 16, 2014. It

also is undisputed that Debtor and Deloach were both experiencing

financial difficulties of which Tapley was aware. Trial Tr. Vol.

33

041614, 65, 186, and 210-11 April 16, 2014. Debtor testified he relied upon Tapley to draft the deeds and other documents pertaining to the property. Trial Tr. Vol. 041614, 224-25, April 16, 2014. Debtor testified that he realized he was transferring title to the property, but did not understand the cancellation of the security deed extinguished the debt owed to Debtor by Inverted, Inc. prior to its full satisfaction. He also had no reason to understand the nature of contingency fee agreements or the full significance of the differing acreage allocations among the Sharpe heirs. Without understanding the legal nuances, Debtor thought he no longer had an ownership interest in the property, but, as he explained to Deloach, funds would still be forthcoming upon the ultimate sale of the property to a third party. Trial Tr. Vol. 041614, 229, 230 and 252-54, April 16, 2014.

Tapley's testimony regarding the identity of his actual client is confusing. At times he testified he was looking out for everyone's interest — Inverted, Inc., Debtor, Deloach and various stakeholders in the Sharpe estate in preparing the deeds and documents. Trial Tr. Vol. 041614, 88 and 94, April 16, 2014.

In the past, Tapley had represented Debtor in civil and criminal matters. Tapley also represented Debtor's grandmother in regards to her claim in the Sharpe estate. In fact, Debtor

34

recommended Tapley to his grandmother.  Trial Tr. Vol. 041614, 33, April 16, 2014.  Debtor also came to Tapley when he and Deloach were experiencing financial difficulties and Tapley put Debtor with Jay Tapley to structure the deal.  Debtor considered Tapley as his family's attorney.  Trial Tr. Vol. 041614, 180 and 205, April 16, 2014.  This relationship allowed Debtor to reasonably believe he could trust and expect Tapley to act as his and Deloach's attorney and representative.  Tapley used his controlling influence to induce Debtor to sign documents that provided significant benefits to the Tapleys in comparison to those provided to Debtor and Deloach. Tapley drafted deeds conveying ownership interests in the property from Debtor to Tapley and Jay Tapley's entities.  He also drafted the security deed from Inverted, Inc. (the company Jay, owns and controls) to Debtor, but failed to also draft an accompanying promissory note from Inverted, Inc. to Debtor.  He failed to draft or recommend the adoption of a joint venture agreement detailing the parties respective rights and obligations.

Tapley's overall conduct and representations induced Debtor to reasonably believe that they had a confidential relationship, with Tapley acting as an attorney on his behalf. Based upon the facts and circumstances of this case, and after considering the evidence and observing the demeanor of the parties,

35

I find a fiduciary relationship existed between Tapley and Debtor. "Fiduciaries are held to the highest standard of the law. A 'fiduciary' is a 'person who is required to act for the benefit of another person on all matters within the scope of their relationship; one who owes to another the duties of good faith, trust, confidence, and candor.'" Alvista Healthcare, Ctr., Inc. v. Miller, 686 S.E.2d 96, 100 (Ga. 2009). Tapley breached the duties of good faith, trust, confidence and candor to Debtor by exercising his controlling influence and superior knowledge to influence Debtor to sign legal documents transferring ownership and cancelling the security deed evidencing the debt owed to Debtor by Inverted, Inc. (a company owned and controlled by Jay), knowing Debtor would trust him. Tapley induced Debtor to sign the documents that were not in Debtor's best interest while benefitting and protecting the interests of the Tapleys, Inverted, Inc. and Tidal Water. Tapley also took his contingency fee owed before it was actually earned. According to Tapley's testimony the contingency fee was satisfied through the various property transfers to Tapley, individually. This amount is contrary to the express terms of the contingency fee agreement. Traditionally, lawyers take some risk in contingency fee arrangements, where fees are based upon what is actually recovered. Yet, Tapley let Debtor think he should convey to Tapley an increased

36

ownership percentage when the acreage actually decreased. Furthermore, these transfers were made while the ownership to the property was still in dispute, before any actual recovery. Given these facts and circumstances, the Court finds an implied attorney-client relationship existed between Debtor and Tapley and Tapley's conduct breached his fiduciary duty owed in such a relationship.

The Trustee also seeks to hold Jay Tapley liable for a purported breach of his fiduciary duty to Debtor as his joint venturer. "Fiduciaries, including those acting as corporate directors, officers, or managing partners, fall within the ambit of the rule requiring them 'to exercise the highest degree of good faith as to all matters connected with the property committed to their care.'" Rollins, 766 S.E.2d at 166. Generally, joint venturers who join together to achieve a common business goal may owe a fiduciary duty to one another. Cushing v. Cohen, 746 S.E.2d 898, 908 (Ga. Ct. App. 2013). The existence of a fiduciary duty is a question of fact. Id.

When the joint venture was started Debtor held legal title to the property and was acting as an agent for Deloach and held an uncontroverted contingent future interest in the property. At the time of the sale to Mr. Jones from Tidal Water, Deloach had passed

37

away,[12] the June 2009 Mullis Order had given Debtor the right to have title to the property.   In 2009, prior to the time of the third party sale to Jones, Debtor had been induced to execute a cancellation of the security deed, but as previously discussed he did not fully understand the implications of this cancellation. Ex. 61.  Debtor always trusted the Tapleys and thought that they would pay the remaining balance owed on the agreed upon $60,000.00 purchase price.

After learning of the sale to Jones, Debtor left an unreturned message with Jay and contacted Tapley to collect the outstanding debt.   Trial Tr. Vol. 041614, 273-274, April 16, 2014. According to Debtor, Tapley said "a deal is a deal" and that Debtor could sue him because he was not giving Debtor another dime.   Trial Tr. Vol. 041416, 274, April 16, 2014.  Debtor wanted to sue Tapley but his mother said to leave it alone.   Trial Tr. Vol. 041416, 274-75, April 16, 2014. As previously discussed Tapley also represented Ms. McAllister, Debtor's grandmother.  Under the terms of the June 2009 Mullis Order, Debtor's mother was to receive a one-third interest in 173 acres, as an heir of Ms. McAllister.  As discussed above, Debtor signed the documents that cancelled the security deed

---

[12]   She passed away before the recordation of the March 2009 Deeds.

in reliance upon the advice and representations made by Tapley.  Jay
Tapley acknowledged he had been involved in numerous land deals
throughout the years.   Debtor's interests were not protected by an
express joint venture agreement, a promissory note, or any other
agreement customarily reached in such transactions.

As a joint venturer, Jay Tapley owed Debtor and Deloach a
fiduciary duty and breached that duty by acting in concert with
Tapley to obtain title and retain proceeds without fulfilling his
fiduciary duty to his joint venturer, Debtor.  Jay Tapley has not
acted in good faith in all matters dealing with his joint venture
relationship with Debtor and has obtained significant financial
benefits at Debtor's expense.

While Jay Tapley argues he cannot be personally liable for
the debts of his corporation Tidal Water, he can be liable when he
participates in the tortious act to defraud his business partner.
See In re Miles, 2007 WL 7141214, at * 2 (Bankr. N.D. Ga. Jan. 10,
2007)("Under Georgia law, a corporate officer is personally liable
for tortious conduct in which he knowingly and intentionally
engaged, despite the fact that he may have used a corporate vehicle
by which to conduct his dealings.").

Given these facts and circumstances, and after considering
all the evidence and observing the parties' demeanor, the Court

39

finds Jay Tapley acted in concert with Tapley and breached his duty of good faith to his fellow joint venturer, the Debtor.  For these reasons, the Court finds Tapley and Jay Tapley breached their respective fiduciary duties to Debtor.

**Damages.**

Because the Trustee has prevailed on his §548 claim and his Georgia Fraudulent Transfer Act claim, he is entitled to recover the value of the property transferred from the initial transferee or from the entity for whose benefit the transfer was made.  See 11 U.S.C. §550;[13] O.C.G.A. §18-2-78.[14]  After considering the evidence,

---

[13]   Section 550(a) provides:

(a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section ... 548[ ] ... of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—

(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or
(2) any immediate or mediate transferee of such initial transferee.

[14]   O.C.G.A. §18-2-78 states in pertinent part:

[T]he creditor may recover judgment for the value of the asset transferred, as adjusted under subsection (c) of this Code section, or the amount necessary to satisfy the creditor's claim, whichever is less. The judgment may be entered against:

(1) The first transferee of the asset or the person for

40

the Court finds the value of the property transferred was $114,000.00, which is the price that a willing buyer paid a willing seller. Jay Tapley offered to sell the property to Mr. Jones for $130,000.00 and after negotiations, the price agreed upon was $114,000.00. Trial Tr. Vol. 011614, 90-91, January 16, 2014. While Mr. Jones' bank loaned him the full purchase price, it was also part of his credit line with the bank, so that is not unusual.

The Court also finds the testimony of the Trustee's expert unpersuasive to establish a value of $160,000.00. The expert's testimony and explanation of his calculations of value lacked certainty. The expert did not sufficiently explain his comparables or adjustments and could not fully support the value he placed on the land and timber valuation. The expert's timber valuation was through incorporation of a third party timber appraiser's valuation, not the expert's own valuation. Even allowing this into evidence the Court, as the trier of fact, determines what weight to give such evidence and the Court still did not find it persuasive. See Fed. R. Evid. 702 and 703. As the

whose benefit the transfer was made; or

(2) Any subsequent transferee other than a good faith transferee or obligee who took for value or from any subsequent transferee or obligee.

41

trier of fact, after evaluating all the evidence, the Court does not give great weight to the ultimate valuation reached by the Trustee's expert.  The fact that the bank's appraised value exceeds the purchase price does not change this conclusion.  The appraisal was obtained by the bank financing Mr. Jones' purchase of the property, and it is customary for a bank's appraised value to exceed the purchase price.  Based upon the evidence, this Court finds the best evidence of the property's value is the negotiated price of $114,000.00 reached between Jay Tapley and Mr. Jones.  For these reasons the Court concludes the Trustee is entitled to recover $114,000.00.

The Trustee may recover this $114,000.00, however, he may have only one recovery.  11 U.S.C. §550(d); see also In re Kingsley, 518 F.3d 874 (11th Cir. 2008)(limiting the Trustee to one satisfaction in order to prevent a windfall to the estate); In re Majestic Star Casino, LLC, 716 F.3d 736, n. 26 (3d Cir. 2013)(Trustee may only recover "net amounts diverted from, that is damages consequently suffered by the creditor body of, a debtor may be recovered" pursuant to §550.)(citing In re Foxmeyer Corp., 296 B.R. 327, 342 (Bankr. D. Del. 2003)(considering recovery for a claim under Code §548); see also HBE Leasing Corp. v. Frank, 48 F.3d 623, 640 (2d Cir. 1995)(prohibiting an "unjustified double recovery" in

an avoidance action); In re Skywalkers, Inc., 49 F.3d 546, 549 (9th Cir. 1995)(applying the "single satisfaction" rule to a debtor's recovery of both a liquor license and the payments made to procure that license); In re Am. Way Serv. Corp., 229 B.R. 496, 532 (Bankr. S.D. Fla. 1999)(entering judgment for Trustee for the value of property transferred and noting the judgment would not reflect any offset or lien because transferees were not "good faith purchasers"). At this point, the single recovery amount is unclear. The Clerk's Office is hereby directed to set a hearing to consider credits that should be given to the Tapleys, if any, for the Trustee's previous recoveries and any setoffs the Tapleys may be entitled to receive. The Court also finds the appropriate amount of special damages for the breach of the fiduciary claims is the $114,000.00 but will consider any appropriate reduction based upon the evidence at the hearing to consider previous recoveries and appropriate setoffs as discussed above.

For the foregoing reasons, the Defendants' motion for directed verdict is ORDERED GRANTED as to the 11 U.S.C. §547 and DENIED as to the §548, Georgia Fraudulent Transfer Act, and breach of fiduciary duty claims. It is FURTHER ORDERED that Jay Tapley's Motion for Directed Verdict based upon lack of personal jurisdiction and improper service is ORDERED DENIED.[15]   The Clerk's Office is

---

[15] Jay Tapley's arguments for dismissal based upon improper service and lack of personal jurisdiction were waived as he did not raise these arguments in his answer to the complaint or in the consolidated pre-trial order that he agreed was binding on him. Trial Tr. Vol. 041514, 124-25, April 15, 2014; Dckt. No. 18; Fed. R.

directed to set a hearing for the Court to consider what credits, if any, should be given to the Tapleys.   Thereafter, a joint and several judgment shall be entered against the Tapleys reflecting the amount deemed owed.

*Susan D. Barrett*

SUSAN D. BARRETT
CHIEF UNITED STATES BANKRUPTCY JUDGE

Dated at Augusta, Georgia

this __31st__ Day of March 2015.

---

Civ. P. 12(b)(2), (4), (5), (g)(2) and (h)(1).

AO 72A
(Rev. 8/82)